**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| CURECRETE DISTRIBUTION, INC., a Utah corporation,<br>*Plaintiff*,<br>vs.<br>NEURALOG, LP d/b/a NEURALABEL PRINTING SOLUTIONS, a Texas limited partnership,<br>*Defendant*. | Case No. 2:26-cv-00868-TC-JCB<br>**<u>JURY TRIAL DEMANDED</u>** |

**<u>FIRST AMENDED ANSWER AND DEFENSES TO PLAINTIFF'S COMPLAINT</u>**

COMES NOW Defendant Neuralog, LP d/b/a NeuraLabel Printing Solutions ("Defendant" or "NeuraLabel"), by counsel, hereby respectfully submits its First Amended Answer and Defenses to the Complaint filed by Plaintiff Curecrete Distribution, Inc. ("Plaintiff" or "Curecrete"), in accordance with Federal Rule of Civil Procedure 15(a)(1)(A).

**<u>COMPLAINT NO. 1:</u>**

> **This is a case about a defective commercial printer. NeuraLabel sold Curecrete a Callisto TotalPress—an industrial label press and inline label converter advertised as a high-speed, high-quality, "trouble-free" commercial label-printing system ("Printer"). NeuraLabel promised that the Printer would perform as advertised. Instead, the Printer has never functioned properly. From the start, the Printer suffered a continuous stream of failures, and despite more than eighteen months of attempted repairs—including two complete replacements of the unit—NeuraLabel has been unable or unwilling to make it work. Curecrete now brings this action to recover the money it paid in this failed purchase and the damages it incurred as a result.**

**<u>ANSWER NO. 1:</u>**

Admitted only that the Callisto print engine was replaced twice, in October 2025 and February 2026. Denied that the TotalPress converter was ever replaced. Otherwise, denied.

**<u>COMPLAINT NO. 2:</u>**

**Plaintiff Curecrete Distribution, Inc. ("Curecrete") is a Utah corporation with its principal place of business in Springville, Utah.**

**ANSWER NO. 2:**

Admitted.

**COMPLAINT NO. 3:**

**Defendant Neuralog, LP d/b/a NeuraLabel Printing Solutions ("NeuraLabel"), is a Texas limited partnership with its principal place of business in Stafford, Texas.**

**ANSWER NO. 3:**

Admitted.

**COMPLAINT NO. 4:**

**NeuraLabel's general partner is Neuralog Management, Inc., a Texas corporation with its principal place of business in Stafford, Texas.**

**ANSWER NO. 4:**

Admitted that Neuralog Management, Inc. has its principal place of business in Stafford, Texas. Denied that Neuralog Management, Inc. is NeuraLabel's general partner. Otherwise, denied.

**COMPLAINT NO. 5:**

**On information and belief, none of NeuraLabel's limited partners are Utah citizens.**

**ANSWER NO. 5:**

Admitted.

**COMPLAINT NO. 6:**

**The amount in controversy exceeds $75,000, exclusive of interest and costs.**

**ANSWER NO. 6:**

Admitted only that Plaintiff purports to assert a claim for damages in excess of $75,000.00. Otherwise, denied.

**COMPLAINT NO. 7:**

> **Subject matter jurisdiction is proper under 28 U.S.C. § 1332(a).**

**ANSWER NO. 7:**

Admitted that Plaintiff invokes jurisdiction under 28 U.S.C. § 1332(a). NeuraLabel's general partner is Neuralog Enterprises, Inc., and the citizenship of NeuraLabel's partners is set out in its disclosure statement. The remainder of Paragraph 7 states a legal conclusion to which no response is required.

**COMPLAINT NO. 8:**

> **Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Curecrete's claims occurred in this district, including NeuraLabel's marketing and sale of the Printer to Curecrete in Utah, its delivery of the Printer and replacement units to Curecrete's facility in Utah, the Printer's failures at that facility, and NeuraLabel's attempted repairs and support directed to Curecrete in Utah.**

**ANSWER NO. 8:**

Admitted only that the goods were shipped to and serviced in part in Utah. Otherwise, denied.

**COMPLAINT NO. 9:**

> **This Court has personal jurisdiction over NeuraLabel under Utah Code § 78B-3205 because NeuraLabel purposefully directed its activities at Utah—including by marketing and selling the Printer to Curecrete in Utah, shipping the Printer, replacement units, and supplies to Curecrete in Utah, and providing more than two years of remote and on-site support to Curecrete in Utah—and Curecrete's claims arise out of those activities.**

**ANSWER NO. 9:**

Denied.

**COMPLAINT NO. 10:**

> **Curecrete is a Utah company engaged in the manufacture and distribution of concrete-treatment products, which requires it to produce labels for its products.**

**ANSWER NO. 10:**

Denied based on a lack of sufficient knowledge and information ("DNK Denied").

**COMPLAINT NO. 11:**

**In early 2024, Curecrete sought an in-house label-printing system that could reliably produce high-quality product labels.**

**ANSWER NO. 11:**

Denied.

**COMPLAINT NO. 12:**

**NeuraLabel marketed the Callisto TotalPress (the "Printer")—a label press and inline label converter—as a solution that would meet Curecrete's needs.**

**ANSWER NO. 12:**

Denied. NeuraLabel's marketing highlights general, subjective qualities of equipment but cannot determine suitability to any particular need.

**COMPLAINT NO. 13:**

**In its marketing materials, NeuraLabel described the Printer as "a versatile, affordable, high-speed color label printer offering quick turnaround of on-demand, short- and mid-run labels."**

**ANSWER NO. 13:**

Denied. While NeuraLabel web pages for the Callisto label printer contained the quoted words before March 8, 2024, it is denied that the statement described the TotalPress converter or the Printer as sold and denied that it is a warranty as opposed to general, subjective marketing language. Otherwise, denied.

**COMPLAINT NO. 14:**

**NeuraLabel further represented that the Printer "was engineered with quality and performance in mind from the ground up," that it was "the most advanced full-color label printer available," and that it was "ideal for a growing business needing a durable in-house label printing system."**

**ANSWER NO. 14:**

Denied. These phrases are on the Callisto pages and the Callisto specifications sheet, not the TotalPress page. The phrase: "The most advanced full-color label printer available" is tied in

context to the HP PageWide print engine. Denied that these statements are warranties as opposed to general, subjective marketing statements.

**COMPLAINT NO. 15:**

> **NeuraLabel represented that the Printer would deliver "a low cost of ownership and easy, trouble-free operation for years to come," that it printed at speeds "up to 90 feet per minute," and that it offered "smooth operation."**

**ANSWER NO. 15:**

Denied. The phrases "low cost of ownership and easy, trouble-free operation for years to come" and "smooth operation" appeared on Callisto web pages, not the TotalPress page. Admitted only that the TotalPress web page stated that it could print, die cut and finish "at up to 90 feet per minute," and denied that this "up to" figure promised that speed for every job. Denied that any of these statements are warranties. Otherwise, denied.

**COMPLAINT NO. 16:**

> **Curecrete contacted NeuraLabel to investigate whether the Printer would meet Curecrete's need to produce labels for its products, including labels that are between 20 and 24 inches in length.**

**ANSWER NO. 16:**

Admitted only that Curecrete contacted NeuraLabel about using the Printer to produce labels for its products. Denied that NeuraLabel represented that the Printer could produce labels between 20 and 24 inches in length. Otherwise, denied.

**COMPLAINT NO. 17:**

> **Before purchasing the Printer, testing was performed on a sample to ensure that that Printer could meet Curecrete's industrial business needs.**

**ANSWER NO. 17:**

Admitted only that sample labels were printed for Curecrete before the purchase. Denied that a sample printer was provided to Curecrete for testing, and denied that labels between 20 and 24 inches in length were tested before the purchase. Otherwise, denied.

**COMPLAINT NO. 18:**

> **Based on NeuraLabel's representations and the satisfactory performance of the sample printer, Curecrete agreed to purchase the Printer.**

**ANSWER NO. 18:**

Denied.

**COMPLAINT NO. 19:**

> **On or about March 8, 2024, Curecrete and NeuraLabel entered into an agreement for the purchase of the Printer, memorialized in an executed NeuraLabel order form (the "Agreement").**

**ANSWER NO. 19:**

Admitted only that Curecrete signed a NeuraLabel quote on March 8, 2024, which speaks for itself and is the best evidence of its own contents. Otherwise, denied.

**COMPLAINT NO. 20:**

> **The Agreement provided that Curecrete's purchase included a "[f]ully inclusive" one-year "Hardware Warranty."**

**ANSWER NO. 20:**

Admitted only that the Agreement speaks for itself and is the best evidence of its own contents. Otherwise, denied.

**COMPLAINT NO. 21:**

> **Curecrete's purchase of the Printer also included a one-year Depot Warranty, a one-year TotalPress Parts Only Warranty, and a one-year Callisto Label Warranty Service Agreement, each of which was effective between June 28, 2024 and June 27, 2025.**

**ANSWER NO. 21:**

Admitted only that those terms are listed on invoice 80369. Denied that they are terms of the March 8th quote. Otherwise, denied.

**COMPLAINT NO. 22:**

**NeuraLabel delivered the Printer to Curecrete's facility in Utah in June 2024.**

**ANSWER NO. 22:**

Admitted only that the Printer was shipped to Curecrete in Utah beginning in June 2024, and that the TotalPress converter was delivered on or about July 3, 2024. Otherwise, denied.

**COMPLAINT NO. 23:**

**In May 2025, Curecrete purchased a TotalPress Platinum Warranty for $8,000 that was effective between June 28, 2025 and June 27, 2026.**

**ANSWER NO. 23:**

Admitted only that in 2025 Curecrete purchased a TotalPress Platinum Warranty for $8,000 covering June 28, 2025 through June 27, 2026. Otherwise, denied.

**COMPLAINT NO. 24:**

**Curecrete also purchased related supplies, including ink, media, a Wi-Fi kit, and service trays for use with the Printer.**

**ANSWER NO. 24:**

Admitted.

**COMPLAINT NO. 25:**

**In total, Curecrete has paid NeuraLabel $114,422.89 for the Printer, supplies, and warranties.**

**ANSWER NO. 25:**

Admitted only that Curecrete paid NeuraLabel for the Printer, supplies, and warranties it purchased. Otherwise, denied.

**COMPLAINT NO. 26:**

**In July 2024, less than one month after receiving the Printer, Curecrete experienced problems printing 20- to 24-inch labels despite the sample printer having had no problem accomplishing the same task. NeuraLabel admitted the Printer was not the same as the sample. To solve the problem, NeuraLabel said it would need to manufacture a new roller arm to replace the one in the Printer.**

**ANSWER NO. 26:**

Admitted only that NeuraLabel shipped an additional roller to Curecrete in July 2024, which was installed. Otherwise, denied.

**COMPLAINT NO. 27:**

**In August 2024, Curecrete experienced additional problems with the Printer, including excessive vibrations while printing. The remedy required constant tightening with special tools.**

**ANSWER NO. 27:**

Denied based on a lack of sufficient knowledge and information ("DNK Denied").

**COMPLAINT NO. 28:**

**In September 2024, Curecrete reported additional problems including banging noises, infeed motor errors, snags while printing, and more.**

**ANSWER NO. 28:**

DNK Denied.

**COMPLAINT NO. 29:**

**In October 2024, Curecrete attempted to print 10,000 labels—a task that should have been well within the Printer's capabilities—but the Printer had to be turned off and rebooted at least 10 times during the process, adding significant time and manpower to the task.**

**ANSWER NO. 29:**

DNK Denied.

**COMPLAINT NO. 30:**

**These and other problems persisted over the next year, during which Curecrete repeatedly raised the issues with NeuraLabel, and NeuraLabel repeatedly told Curecrete that it was working on and diagnosing the problems. But NeuraLabel never resolved the issues.**

**ANSWER NO. 30:**

Denied.

**COMPLAINT NO. 31:**

**In September 2025, Curecrete reported still more problems, including ink output that was unresponsive across both computer-initiated and direct printing attempts. Curecrete told NeuraLabel that it felt it had been sold a "lemon" and that the Printer required far too much troubleshooting. Curecrete asked NeuraLabel to discuss whether the Printer could be fixed or whether another solution was needed.**

**ANSWER NO. 31:**

Admitted only that Plaintiff alleged that it was experiencing some problems. Otherwise, DNK Denied.

**COMPLAINT NO. 32:**

**In October 2025, the problems continued. Curecrete's attempts to remotely access the Printer repeatedly resulted in errors. Although updates were eventually installed locally, they did not resolve the problems.**

**ANSWER NO. 32:**

Admitted only that NeuraLabel performed a remote firmware update from September 30 to October 1, 2025, and shipped a replacement Callisto print engine on October 15, 2025. Otherwise, denied.

**COMPLAINT NO. 33:**

**In or around November 2025, an entirely new printer unit was installed. The problems nonetheless persisted, including continued print-job failures and unresolved label-alignment issues.**

**ANSWER NO. 33:**

Admitted only that the replacement Callisto CAL2025509 was shipped on October 15, 2025. Denied that problems persisted as stated.

**COMPLAINT NO. 34:**

**In January 2026, Curecrete reported additional problems and sent NeuraLabel videos documenting them. The parties spent more than four hours troubleshooting, but the problems persisted. Curecrete again expressed its frustration and explained that it had a time-sensitive need to produce labels. The problems were not resolved, and additional problems, including tearing, persisted.**

**ANSWER NO. 34:**

DNK Denied.

**COMPLAINT NO. 35:**

**In February 2026, NeuraLabel sent a new die. That did not fix the problems.**

**ANSWER NO. 35:**

Admitted only that NeuraLabel sent a die in February 2026. Otherwise, denied.

**COMPLAINT NO. 36:**

**The problems with the Printer have not been fixed to this day.**

**ANSWER NO. 36:**

Denied. NeuraLabel provided a solution, but Curecrete stopped working with NeuraLabel to apply it.

**COMPLAINT NO. 37:**

**Since the purchase, the Printer's component units have been replaced at least twice, and the third unit still does not function properly. The replacement units were delivered without Wi-Fi adapters installed, rendering them unusable on arrival.**

**ANSWER NO. 37:**

Admitted only that two replacement Callisto print engines shipped: CAL2025509 on October 15, 2025 (with Wi-Fi kit, installed by Travis) and CAL2025589 on February 11, 2026. The converter was never replaced. DNK Denied that the third unit does not work. Otherwise, denied.

**COMPLAINT NO. 38:**

**The problems with the Printer have included, among others, excessive vibration, banging noises, infeed motor errors, snags and tearing while printing, unresponsive**

> **ink output, belt malfunctions, error states, adhesive accumulation leading to material tearing, uneven die pressure, accelerated die wear, and inconsistent output between runs.**

**ANSWER NO. 38:**

Admitted only that Curecrete reported some of these issues to NeuraLabel. Otherwise, denied.

**COMPLAINT NO. 39:**

> **Curecrete has wasted countless hours attempting to troubleshoot the Printer with NeuraLabel's staff.**

**ANSWER NO. 39:**

Admitted only that certain corrective measures were jointly and cooperatively undertaken. Otherwise, denied.

**COMPLAINT NO. 40:**

> **Because the Printer has not functioned as promised, Curecrete has missed deadlines, has been unable to print labels necessary for its business, and has lost a significant amount of money on man-hours and on materials, including ink and paper, due to the Printer's constant errors and faults.**

**ANSWER NO. 40:**

Denied.

**COMPLAINT NO. 41:**

> **Throughout this period, NeuraLabel repeatedly assured Curecrete that the problems would be resolved, and Curecrete reasonably relied on those assurances and continued to work with NeuraLabel in an effort to make the Printer functional.**

**ANSWER NO. 41:**

Admitted only that Neuralog offered continued support, parts and replacements. Otherwise, denied.

**COMPLAINT NO. 42:**

**By the spring of 2026, it became clear that NeuraLabel either could not or would not make the Printer work, despite eighteen months of NeuraLabel insisting it could fix the issues and two total unit replacements.**

**ANSWER NO. 42:**

Denied. Curecrete stopped responding to NeuraLabel's continued support efforts.

**COMPLAINT NO. 43:**

**On April 15, 2026, Curecrete, through counsel, notified NeuraLabel in writing that it rejected the Printer and revoked any acceptance of the Printer. Curecrete notified NeuraLabel of the Printer's nonconformity within a reasonable time after discovering the breach, as required by Utah Code §§ 70A-2-602, -607, and -608. Curecrete demanded that NeuraLabel remove the Printer from Curecrete's facility and refund the amounts it had paid for the Printer, supplies, and warranties.**

**ANSWER NO. 43:**

Admitted only that Curecrete's counsel, Trevor J. Lee, sent a letter dated April 15, 2026 addressed to Duncan Griffiths and Ryan DuBois, emailed to them by his office on April 17, 2026 (about 2:41 PM) and stating it was also sent by certified mail. Otherwise, denied. It demanded $113,505.44, not the Complaint's $114,422.89. The letter says nothing about the 20-24 inch label length or a sample that is now supposedly central to the Plaintiff's Complaint.

**COMPLAINT NO. 44:**

**To date, NeuraLabel has not removed the Printer and has not refunded any of the amounts Curecrete paid.**

**ANSWER NO. 44:**

Admitted, but denied that Plaintiff is entitled to such relief.

**COMPLAINT NO. 45:**

**Neither the Agreement nor the warranties included with Curecrete's initial purchase of the Printer—including the Hardware Warranty, Depot Warranty, TotalPress Parts Only Warranty, and the Callisto Label Warranty Service Agreement—included disclaimers of implied warranties, exclusive-remedy provisions, or limitations on damages.**

**ANSWER NO. 45:**

The Agreement and warranties speak for themselves. Curecrete later accepted the TotalPress Platinum Warranty terms in writing, which disclaim implied warranties, make repair or replacement the exclusive remedy, and limit damages. This was a novation and replacement as to any other warranties. Otherwise, denied.

**COMPLAINT NO. 46:**

> **The TotalPress Platinum Warranty purports to limit Curecrete's remedy to repair or replacement of the Printer, and purports to disclaim implied warranties, to exclude incidental and consequential damages, and to cap NeuraLabel's potential liability at the amount Curecrete paid for the Printer. But those limitations and disclaimers were not part of the parties' March 2024 Agreement. The TotalPress Platinum Warranty corresponds to a separate service agreement that NeuraLabel sold to Curecrete in May 2025, more than a year after the sale of the Printer. As a result, the TotalPress Platinum Warranty's limitations and disclaimers never became part of the basis of the parties' bargain and do not limit Curecrete's remedies.**

**ANSWER NO. 46:**

Admitted that the TotalPress Platinum Warranty contains the terms stated in it, which speak for themselves. Denied that those terms do not limit Curecrete's remedies. Curecrete accepted the TotalPress Platinum Warranty terms in writing and paid for them. This was a novation and replacement as to any other warranties. Otherwise, denied.

**COMPLAINT NO. 47:**

> **Even assuming Curecrete's remedies are limited to those provided in the TotalPress Platinum Warranty, those exclusive remedies have failed of their essential purpose. NeuraLabel has proved, over the course of three separate printer units and more than eighteen months of attempted fixes, that it cannot or will not repair or replace the Printer so as to make it conform to what was promised. Those exclusive remedies have, therefore, deprived Curecrete of the substantial value of its bargain. Because the TotalPress Platinum Warranty's limitations on remedies and damages have failed in their essential purpose, they are unenforceable under Utah Code § 70A-2-719(2), and Curecrete is entitled to all remedies available under Utah law.**

**ANSWER NO. 47:**

Denied. NeuraLabel performed repairs, including replacing the Callisto print engine twice. The TotalPress converter was never replaced. Curecrete continued to use the Printer and to purchase supplies for it. Otherwise, denied.

**COMPLAINT NO. 48:**

**The TotalPress Platinum Warranty's disclaimers, exclusions, and limitations are also unconscionable and unenforceable to the extent they would leave Curecrete with no effective remedy for a $90,000 Printer that has never functioned properly.**

**ANSWER NO. 48:**

Denied. The TotalPress was $85,000. The invoice 80369 total of $91,583 included freight and accessories.

**COMPLAINT NO. 49:**

**Curecrete ceased using the Printer after sending the April 15, 2026 notice.**

**ANSWER NO. 49:**

DNK Denied.

**COMPLAINT NO. 50:**

**Curecrete incorporates by reference all preceding allegations.**

**ANSWER NO. 50:**

Defendant incorporates by reference its answers to all prior paragraphs to Plaintiff's complaint as though fully set forth and restated herein.

**COMPLAINT NO. 51:**

**Curecrete and NeuraLabel entered into the Agreement for the purchase of the Printer.**

**ANSWER NO. 51:**

Admitted.

**COMPLAINT NO. 52:**

**Curecrete performed its obligations under the Agreement, including by paying NeuraLabel $114,422.89 for the Printer, warranties, and printing supplies.**

**ANSWER NO. 52:**

Admitted only that the payment for the printer was received. Otherwise, denied.

**COMPLAINT NO. 53:**

**NeuraLabel breached the Agreement by failing to deliver a Printer that functioned as required by the Agreement and by failing to repair or replace the Printer so that it would conform to the requirements Curecrete bargained for.**

**ANSWER NO. 53:**

Objected to as stating and calling for a legal conclusion. Denied to the extent an answer is required.

**COMPLAINT NO. 54:**

**As a direct and proximate result of NeuraLabel's breach, Curecrete has been damaged in an amount to be proven at trial, but no less than $114,422.89, together with incidental and consequential damages, including the cost of supplies, the time and money Curecrete spent attempting to make the Printer work, and the losses Curecrete sustained from its inability to print labels as necessary for its business operations.**

**ANSWER NO. 54:**

Objected to as stating and calling for a legal conclusion. Denied to the extent an answer is required.

**COMPLAINT NO. 55:**

**Curecrete incorporates by reference all preceding allegations.**

**ANSWER NO. 55:**

Defendant incorporates by reference its answers to all prior paragraphs to Plaintiff's complaint as though fully set forth and restated herein.

**COMPLAINT NO. 56:**

**The Printer NeuraLabel delivered was nonconforming because it did not function as required by the Agreement or as advertised and promised.**

**ANSWER NO. 56:**

Denied.

**COMPLAINT NO. 57:**

> **The nonconformity substantially impaired the value of the Printer to Curecrete, rendering it practically useless for Curecrete's purposes.**

**ANSWER NO. 57:**

Objected to as stating and calling for a legal conclusion. Denied to the extent an answer is required.

**COMPLAINT NO. 58:**

> **Curecrete justifiably revoked its acceptance of the Printer under Utah Code § 70A2-608 by notifying NeuraLabel in writing on April 15, 2026. Curecrete accepted the Printer on the reasonable assumption that it would perform the same as the sample Curecrete tested before purchasing the Printer. But unbeknownst to Curecrete, NeuraLabel delivered a different Printer that did not perform in accordance with Curecrete's reasonable expectations. Due to NeuraLabel's warranties and repeated assurances, Curecrete reasonably expected that the Printer's nonconformity would be cured, but it was not.**

**ANSWER NO. 58:**

Denied. Curecrete gave its notice about 21 months after the TotalPress was delivered on July 3, 2024, after continuing to use the Printer. NeuraLabel disputed the notice in writing on May 11, 2026 and June 5, 2026. Otherwise, denied.

**COMPLAINT NO. 59:**

> **In the alternative, to the extent the Printer is deemed never to have been accepted, Curecrete rightfully rejected the Printer under Utah Code § 70A-2-602 by the same April 15, 2026 notice.**

**ANSWER NO. 59:**

Denied. Curecrete accepted, used, and paid for the Printer, and did not reject it within a reasonable time after delivery. Otherwise, denied.

**COMPLAINT NO. 60:**

**Curecrete's revocation occurred within a reasonable time after it discovered that the nonconformity would not be cured (despite NeuraLabel's repeated assurances to the contrary), and before any substantial change was made in the condition of the Printer not caused by its own defects. Curecrete continued to work with NeuraLabel toward a cure until it became clear that NeuraLabel could not or would not make the Printer conform.**

**ANSWER NO. 60:**

Denied. Units were returned without inserts which led to static and tension issues.

**COMPLAINT NO. 61:**

**Based on its justifiable revocation of acceptance or rightful rejection, Curecrete is entitled under Utah Code § 70A-2-711 to recover the amounts it paid, together with incidental and consequential damages under Utah Code § 70A-2-715, and NeuraLabel is obligated to remove the Printer from Curecrete's facility.**

**ANSWER NO. 61:**

Objected to as stating and calling for a legal conclusion. Denied to the extent an answer is required.

**COMPLAINT NO. 62:**

**Curecrete has been damaged in an amount to be proven at trial, but no less than $114,422.89, together with incidental and consequential damages.**

**ANSWER NO. 62:**

Objected to as stating and calling for a legal conclusion. Denied to the extent an answer is required.

**COMPLAINT NO. 63:**

**Curecrete incorporates by reference all preceding allegations.**

**ANSWER NO. 63:**

Defendant incorporates by reference its answers to all prior paragraphs to Plaintiff's complaint as though fully set forth and restated herein.

**COMPLAINT NO. 64:**

> **Through the Agreement, warranties, marketing materials, and other means, NeuraLabel made affirmations of fact, promises, and descriptions about the Printer that became part of the basis of the bargain and created express warranties under Utah Code § 70A-2-313(1)(a)–(b).**

**ANSWER NO. 64:**

Admitted only that the parties signed a quote dated March 8, 2024, which speaks for itself and is the best evidence of its own contents. Otherwise, denied.

**COMPLAINT NO. 65:**

> **Among other things, NeuraLabel expressly warranted that the Printer would be free from defects in material and workmanship for twelve months; that it was a "high-speed color label printer" capable of printing at speeds "up to 90 feet per minute"; that it was "the most advanced full-color label printer available"; that it offered "trouble-free operation" and "smooth operation"; and that it would produce "high-quality" labels.**

**ANSWER NO. 65:**

Admitted only that the parties signed a quote dated March 8, 2024, which speaks for itself and is the best evidence of its own contents. Otherwise, denied.

**COMPLAINT NO. 66:**

> **In addition, by providing a sample printer for Curecrete to test before purchasing the Printer, NeuraLabel expressly warranted that the whole of the Printer would conform to the sample under Utah Code § 70A-2-313(1)(c).**

**ANSWER NO. 66:**

Objected to as stating and calling for a legal conclusion. Denied to the extent an answer is required.

**COMPLAINT NO. 67:**

> **The Printer did not conform to these express warranties. It was not free from defects, did not operate as described, and did not perform as promised.**

**ANSWER NO. 67:**

Denied.

**<u>COMPLAINT NO. 68:</u>**

> **Curecrete notified NeuraLabel of the Printer's nonconformity on numerous occasions over more than eighteen months.**

**<u>ANSWER NO. 68:</u>**

Admitted only that there were service requests between July of 2024 and April of 2026 (with no emails Nov. 27, 2024 through April 10, 2025). Otherwise, denied.

**<u>COMPLAINT NO. 69:</u>**

> **NeuraLabel breached its express warranties by failing to provide a conforming Printer and by failing to repair or replace the Printer so that it would conform.**

**<u>ANSWER NO. 69:</u>**

Objected to as stating and calling for a legal conclusion. Denied to the extent an answer is required.

**<u>COMPLAINT NO. 70:</u>**

> **NeuraLabel's attempts to remedy the Printer's nonconformity through repairs and replacements failed of their essential purpose, so any attempts to limit Curecrete's remedies and damages are therefore unenforceable under Utah Code § 70A-2-719. Those limitations are also unenforceable because they never became part of the basis of the parties' bargain and are unconscionable.**

**<u>ANSWER NO. 70:</u>**

Objected to as stating and calling for a legal conclusion. Denied to the extent an answer is required.

**<u>COMPLAINT NO. 71:</u>**

> **In the alternative, if Curecrete is deemed to have accepted the Printer and not to have revoked that acceptance, Curecrete is entitled under Utah Code § 70A-2-714 to recover damages for the Printer's nonconformity, measured by the difference between the value of the Printer as accepted and the value it would have had if it had been as warranted, together with incidental and consequential damages under Utah Code § 70A-2-715. Because the Printer never functioned properly, its value as delivered is effectively zero, while its value as warranted was no less than the $114,422.89 Curecrete paid.**

**<u>ANSWER NO. 71:</u>**

Objected to as stating and calling for a legal conclusion. Denied to the extent an answer is required.

**COMPLAINT NO. 72:**

**As a direct and proximate result of NeuraLabel's breach of express warranty, Curecrete has been damaged in an amount to be proven at trial, but no less than $114,422.89, together with incidental and consequential damages.**

**ANSWER NO. 72:**

Objected to as stating and calling for a legal conclusion. Denied to the extent an answer is required.

**COMPLAINT NO. 73:**

**Curecrete incorporates by reference all preceding allegations.**

**ANSWER NO. 73:**

Defendant incorporates by reference its answers to all prior paragraphs to Plaintiff's complaint as though fully set forth and restated herein.

**COMPLAINT NO. 74:**

**NeuraLabel deals in label presses and label-printing equipment, holds itself out as having knowledge and skill peculiar to presses and label-printing equipment, and is a merchant of presses and label-printing equipment.**

**ANSWER NO. 74:**

Admitted only that NeuraLabel sells label-printing equipment. Otherwise, denied.

**COMPLAINT NO. 75:**

**Under Utah Code § 70A-2-314, there is an implied warranty that the Printer was merchantable or fit for the ordinary purposes for which such equipment is used, including the reliable production of labels.**

**ANSWER NO. 75:**

Objected to as stating and calling for a legal conclusion. Denied to the extent an answer is required.

**COMPLAINT NO. 76:**

**Neither the Agreement nor the warranties included with Curecrete's initial purchase of the Printer—including the Hardware Warranty, Depot Warranty, TotalPress Parts Only Warranty, and the Callisto Label Warranty Service Agreement—included a disclaimer of the implied warranty of merchantability.**

**ANSWER NO. 76:**

The Agreement and any applicable warranties speak for themselves and are the best evidence of their own contents. Otherwise, denied.

**COMPLAINT NO. 77:**

**The Printer was not merchantable because it could not reliably produce labels—the ordinary purpose for which it was sold—and instead suffered continuous and unremedied failures from the time of delivery.**

**ANSWER NO. 77:**

Objected to as stating and calling for a legal conclusion. Denied to the extent an answer is required.

**COMPLAINT NO. 78:**

**NeuraLabel breached the implied warranty of merchantability.**

**ANSWER NO. 78:**

Objected to as stating and calling for a legal conclusion. Denied to the extent an answer is required.

**COMPLAINT NO. 79:**

**To the extent NeuraLabel purported to disclaim the implied warranty of merchantability, that disclaimer is unenforceable because it never became part of the basis of the parties' bargain, because the exclusive remedy failed of its essential purpose, and because the disclaimer is unconscionable under the circumstances, leaving Curecrete without any effective remedy for a press that has never functioned.**

**ANSWER NO. 79:**

Objected to as stating and calling for a legal conclusion. Denied to the extent an answer is required.

**COMPLAINT NO. 80:**

**As a direct and proximate result of NeuraLabel's breach of the implied warranty of merchantability, Curecrete has been damaged in an amount to be proven at trial, but no less than $114,422.89, together with incidental and consequential damages.**

**ANSWER NO. 80:**

Objected to as stating and calling for a legal conclusion. Denied to the extent an answer is required.

**COMPLAINT NO. 81:**

**Curecrete incorporates by reference all preceding allegations.**

**ANSWER NO. 81:**

Defendant incorporates by reference its answers to all prior paragraphs to Plaintiff's complaint as though fully set forth and restated herein.

**COMPLAINT NO. 82:**

**At the time the parties entered the Agreement, NeuraLabel had reason to know of the particular purpose for which Curecrete required the Printer: producing labels for Curecrete's products, including labels that are between 20 and 24 inches in length.**

**ANSWER NO. 82:**

Admitted only that, before the sale, NeuraLabel knew Curecrete intended to use the Printer to make labels for its products. Denied that NeuraLabel knew or had reason to know that Curecrete required labels longer than 23 inches. Otherwise, denied.

**COMPLAINT NO. 83:**

**At the time the parties entered the Agreement, NeuraLabel had reason to know that Curecrete was relying on NeuraLabel's skill or judgment to furnish a printer that was capable of reliably producing labels for Curecrete's products, including labels that are between 20 and 24 inches in length, because Curecrete had communicated that need and expectation to NeuraLabel.**

**ANSWER NO. 83:**

Denied that NeuraLabel knew or had reason to know that Curecrete was relying on NeuraLabel's skill or judgment to furnish a printer capable of producing labels longer than 23 inches. Otherwise, denied.

**COMPLAINT NO. 84:**

> **Under Utah Code § 70A-2-315, there is an implied warranty of fitness for particular purpose that the Printer was fit for the particular purpose for which Curecrete acquired the Printer.**

**ANSWER NO. 84:**

Paragraph 84 states a legal conclusion to which no response is required. To the extent a response is required, denied. Denied that Utah law was or is applicable.

**COMPLAINT NO. 85:**

> **Neither the Agreement nor the warranties included with Curecrete's initial purchase of the Printer—including the Hardware Warranty, Depot Warranty, TotalPress Parts Only Warranty, and the Callisto Label Warranty Service Agreement—included a disclaimer of the implied warranty of fitness for particular purpose.**

**ANSWER NO. 85:**

Objected to as stating and calling for a legal conclusion and assuming erroneous facts. Denied to the extent an answer is required. Any warranties that are applicable speak for themselves and are the best evidence of their own contents. Otherwise, denied.

**COMPLAINT NO. 86:**

> **The Printer was not fit for the particular purpose for which Curecrete acquired the Printer because it could not reliably produce labels for Curecrete's products, including labels that are between 20 and 24 inches in length, and instead suffered continuous and unremedied failures from the time of delivery.**

**ANSWER NO. 86:**

Denied that the Printer was not fit for the purpose for which Curecrete acquired it, and denied that the Printer suffered continuous and unremedied failures. Otherwise, denied.

**COMPLAINT NO. 87:**

**NeuraLabel breached the implied warranty of fitness for particular purpose.**

**ANSWER NO. 87:**

Objected to as stating and calling for a legal conclusion. Denied to the extent an answer is required.

**COMPLAINT NO. 88:**

**To the extent NeuraLabel purported to disclaim the implied warranty of fitness for particular purpose, that disclaimer is unenforceable because it never became part of the basis of the parties' bargain, because the exclusive remedy failed of its essential purpose, and because the disclaimer is unconscionable under the circumstances, leaving Curecrete without any effective remedy for a press that has never functioned.**

**ANSWER NO. 88:**

Objected to as stating and calling for a legal conclusion. Denied to the extent an answer is required.

**COMPLAINT NO. 89:**

**As a direct and proximate result of NeuraLabel's breach of the implied warranty of fitness for particular purpose, Curecrete has been damaged in an amount to be proven at trial, but no less than $114,422.89, together with incidental and consequential damages.**

**ANSWER NO. 89:**

Objected to as stating and calling for a legal conclusion. Denied to the extent an answer is required.

**COMPLAINT NO. 90:**

**Curecrete incorporates by reference all preceding allegations.**

**ANSWER NO. 90:**

Defendant incorporates by reference its answers to all prior paragraphs to Plaintiff's complaint as though fully set forth and restated herein.

**COMPLAINT NO. 91:**

**This claim is pleaded in the alternative in the event it is determined that the Agreement does not govern some or all of the harm Curecrete has suffered.**

**ANSWER NO. 91:**

Denied. An express contract covers the subject matter of the dispute.

**COMPLAINT NO. 92:**

**Curecrete conferred a benefit on NeuraLabel by paying it $114,422.89 for the Printer, supplies, and warranties.**

**ANSWER NO. 92:**

Admitted only that Curecrete paid NeuraLabel for goods and services that NeuraLabel delivered. Denied that any benefit conferred was unjust. Otherwise, denied.

**COMPLAINT NO. 93:**

**NeuraLabel knew of and accepted that benefit.**

**ANSWER NO. 93:**

Admitted only that NeuraLabel received some payment for goods and services delivered and for a supplemental warranty. Otherwise, denied.

**COMPLAINT NO. 94:**

**Under the circumstances, it would be inequitable for NeuraLabel to retain that benefit without providing a functioning Printer or refunding Curecrete's payments.**

**ANSWER NO. 94:**

Denied.

**COMPLAINT NO. 95:**

**To the extent NeuraLabel's conduct is not governed by an enforceable contract, the Court should order NeuraLabel to disgorge the benefit it unjustly obtained from Curecrete.**

**ANSWER NO. 95:**

Denied.

**WHEREFORE:**

**Curecrete respectfully requests that the Court enter judgment against NeuraLabel as follows:**

**A. Curecrete's damages in an amount to be proven at trial, but no less than $114,422.89, including the amounts Curecrete paid for the Printer, supplies, and warranties;**

**B. an order requiring NeuraLabel to remove the Printer from Curecrete's facility and/or to reimburse Curecrete for the cost of having the Printer removed from its facility;**

**C. Curecrete's incidental and consequential damages, including the time and money Curecrete spent attempting to make the Printer work and the losses resulting from its inability to print labels as promised;**

**D. prejudgment and post-judgment interest as allowed by law;**

**E. Curecrete's costs of suit pursuant to Rule 54(d) of the Federal Rules of Civil Procedure; and**

**F. such other and further relief as the Court deems just and proper.**

**ANSWER:**

Admitted only that Plaintiff seeks the stated relief. Denied that Plaintiff is entitled to the requested relief or to any other relief. Otherwise, denied.

## DEFENSES AND AFFIRMATIVE DEFENSES

1. **Misuse.** Plaintiff's misuse of the equipment caused many of its asserted problems and voids any and all warranties. Diagnoses point to static/ESD, an idler switch set "all the way to super tight," laminate tension, glossy BOPP media, and generator power. At one point, Plaintiff was on the wrong Wi-Fi and the problem resolved when that was corrected. Units were returned without inserts which led to static and tension issues.

2. **No Pre-Payment Sample Term.** Curecrete did not test labels, samples or otherwise, until after purchase and delivery of TotalPress. Therefore, the sample testing could not have covered any warranties.

3. **Novation and Supersession.** The TotalPress Platinum Warranty novated and superseded any prior or different express or implied warranty terms.

4. **<u>Warranty Limitations and Disclaimers</u>.** The TotalPress Platinum Warranty superseded warranty disclaimers and all other express or implied warranties.

5. **<u>Damages Disclaimers</u>.** The TotalPress Platinum warranty disclaimed and excluded all incidental or consequential damages.

6. **<u>Invalid and Unenforceable Revocation of Acceptance</u>.** Plaintiff's two-year delay, misuse of the equipment, and the novating and superseding TotalPress Platinum Warranty make Plaintiff's attempted revocation of acceptance invalid and unenforceable.

7. **<u>Not a Warranty</u>.** The advertising content relied on by Plaintiff was merely generalized, subjective marketing statements and opinions, and did not constitute warranties, statements of fact, or promises of future performance.

8. **<u>Express Contract Bar</u>.** Plaintiff's pleading and filing of express contracts bars Plaintiff's claims for unjust enrichment, *quantum meruit*, or any other implied contract.

9. **<u>Assumption of Risk</u>.** The December 29, 2023 email put label testing and its consequences on the Plaintiff customer.

10. **<u>Improper Venue.</u>** Utah law does not apply and venue is improper in this court. To the extent Plaintiff relied on the website terms for its warranty claim, this case must be tried in Texas court and is subject to mandatory arbitration.

11. **<u>Arbitration.</u>** At least to the extent Plaintiff makes warranty claims based on Defendant's website, this case is subject to mandatory arbitration.

Respectfully Submitted This 23rd Day of November, 2026:

**NEURALOG, LP d/b/a NEURALABEL PRINTING SOLUTIONS**

By: /s/ Matthew Morrison
Counsel

Matthew Morrison
Morrison Law Office
1887 N 270 E
Orem, UT 84057
Phone: (801) 845-2581
Email: matt@oremlawoffice.com
*Local Counsel for Defendant*

By: /s/ Michael C. Whitticar
Counsel

Michael C. Whitticar (V.S.B. No. 32968)
NOVA IP Law, PLLC
155 Broadview Avenue, Suite 200
Warrenton, VA 20186
Phone: (571) 386-2980
Fax: (855) 295-0740
Email: mikew@novaiplaw.com
*Virginia Counsel for Defendant*
*Pro Hac Vice* Planned

**CERTIFICATE OF SERVICE**

I hereby certify that on This 23rd Day of November, 2026, this document was filed with the Court and served on the following counsel of record by email and mail:

Trevor J. Lee (16703)
Taylor P. Kordsiemon (17257)
Brianna N. Espinosa (20285)
Manning Curtis Bradshaw & Bednar PLLC
201 South Main Street, Suite 750
Salt Lake City, Utah 84111
tlee@mc2b.com
tkordsiemon@mc2b.com
bespinosa@mc2b.com
(801) 363-5678
*Attorneys for Plaintiff*

By: /s/ *Matthew Morrison*
Matthew Morrison